IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| T&M INDUSTRIALS, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Case No. 15 C 3107 |
| ) | |
| GREAT LAKES SALT, INC. and ) | |
| MIDWEST SALT, LLC, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

On June 5, 2015, Plaintiff T&M Industrials ("T&M") filed a three-count Second Amended Complaint against Defendants Great Lakes Salt, Inc. ("Great Lakes") and Midwest Salt, LLC ("Midwest"), alleging breach of contract, conversion, and intentional interference with contract. After Great Lakes filed for Chapter 7 bankruptcy protection on October 30, 2015, the Court stayed the present proceedings against Great Lakes. Before the Court is Midwest's motion for leave to file its amended Answer, affirmative defenses, and counterclaim to Plaintiff's Second Amended Complaint. For the following reasons, the Court, in its discretion, grants Midwest's motion. [54].

## FACTUAL BACKGROUND

In its Second Amended Complaint, T&M alleges that on October 29, 2014 it entered into a contract with Great Lakes to purchase 52,000 metric tons of road salt. (R. 21, Second Am. Compl. ¶ 9.) Pursuant to the contract (among other clauses): (1) T&M agreed to pay Great Lakes $89.00 per metric ton of road salt; (2) the road salt could not have a moisture content of more than two percent; (3) Great Lakes agreed to immediately reimburse T&M for any shortage

of road salt; (4) Great Lakes and T&M agreed to split the profits of the sale of any road salt to third parties once T&M recuperated its costs associated with the road salt; and (5) Great Lakes could not sell the road salt directly to any third party. (*Id.* ¶¶ 10, 11, 13, 19, 20.) On October 15, 2014, T&M allegedly tested, identified, and took possession of 35,776.6 metric tons of road salt that had arrived in Quebec, Canada, aboard the Nord Barcelona vessel. (*Id.* ¶ 21.) T&M contends that under the terms of the October 29, 2014 contract, Great Lakes agreed to transport the road salt from Quebec, Canada, to 2900 East 106th Avenue, Chicago Illinois ("106th Street Dock") by November 10, 2014. (*Id.* ¶ 12.) According to T&M, Great Lakes agreed to store the road salt for T&M at the 106th Street Dock until March 31, 2015. (*Id.* ¶ 15.) Between October 22 and October 24, 2014, T&M allegedly paid $665,000 to Great Lakes, and $1,192,964.50 directly to the shipping company at Great Lakes' request, for the road salt. (*Id.* ¶¶ 22–24.)

On October 31, 2014—according to T&M—Great Lakes provided a bill of lading to T&M, agreeing to ship 27,282.6 metric tons of road salt from Quebec to the 106th Street Dock on the Henry Jackman vessel ("the Henry Jackman shipment"). (*Id.* ¶ 26.) T&M attached a copy of the bill of lading to its Second Amended Complaint. (*Id.* Ex. B.) On November 7, 2014, T&M claims to have tested, identified, and taken possession of 8,949.9 metric tons of road salt in Quebec, Canada. (*Id.* ¶ 27.) Great Lakes agreed to ship the 8,949.9 metric tons of road salt to the 106th Street Dock and provided T&M with another bill of lading for the road salt's passage aboard the Sedna Desgagnes vessel ("the Sedna Desgagnes shipment"). (*Id.* ¶ 28.) T&M attached a copy of the bill of lading for the Sedna Desgagnes shipment to its Second Amended Complaint. (*Id.* Ex. C.) T&M asserts that both the Henry Jackman shipment and the Sedna Desgagnes shipments arrived at the 106th Street Dock during the first two weeks of November 2014. (*Id.* ¶¶ 29–30.) Between November 10 and November 29, 2014, T&M allegedly paid

2

Great Lakes an additional $1,924,159.50 for the road salt. (*Id.* ¶¶ 31–35.) After the Henry Jackman and Sedna Desgagnes shipments arrived in Chicago, T&M claims to have sold 6,900 metric tons of the road salt to third parties. (*Id.* ¶ 36.)

According to T&M, despite paying Great Lakes millions of dollars, in mid to late November, Great Lakes sold the remaining Henry Jackman and Sedna Desgagnes shipments of road salt—minus the 6,900 metric tons—to another customer, Midwest Salt ("Midwest"), without T&M's knowledge or consent. (*Id.* ¶ 38.) T&M alleges that Midwest and/or Great Lakes, working in concert, removed the same road salt from the 106th Street Dock. (*Id.* ¶ 40.) T&M further alleges that at the time Midwest purchased the Henry Jackman and Sedna Desgagnes shipments of road salt from Great Lakes, Midwest was aware of the contract between Great Lakes and T&M, and knew that the Henry Jackman and Sedna Desgagnes shipments belonged to T&M. (*Id.* ¶¶ 41–42.) T&M contends that it learned of Midwest's actions on November 29, 2014, at which time it suspended all further payments to Great Lakes. (*Id.* ¶¶ 43–44.) In December 2014, T&M allegedly took possession of 8,333 metric tons of road salt in New Orleans. (*Id.* ¶ 45.) According to T&M, Great Lakes shipped the New Orleans road salt to the 106th Street Dock in January 2015, and agreed to change the price for the New Orleans road salt from $89.00 per metric ton to $66.00. (*Id.* ¶¶ 45–47.)

As of the filing of its Second Amended Complaint, T&M asserts that it has not received approximately 17,500 metric tons of road salt pursuant to the October 29, 2014 contract despite the fact that it paid Great Lakes over $3,700,000 for the road salt. (*Id.* ¶ 48.) In addition, T&M contends that Midwest converted the road salt and knowingly interfered with its contract with Great Lakes. (*Id.* ¶¶ 58–67.) Further, T&M alleges that it has sustained damages exceeding $2,600,000 as a result of Great Lakes' and Midwest's actions. (*Id.* ¶ 68.)

## PROCEDURAL BACKGROUND

On June 19, 2015, Great Lakes filed its Answer to T&M's Second Amended Complaint. Great Lakes admits entering into the October 29, 2014 contract with T&M, but alleges that T&M was the first party to materially breach the contract. (R. 22, Answer to Am. Compl. First Affirmative Defense at 15.) Midwest filed its Answer to T&M's Second Amended Complaint on June 19, 2015, as well, and admitted that it knew Great Lakes was attempting to sell 52,000 metric tons of road salt to T&M, however, Midwest contends that Great Lakes planned to ship T&M's road salt aboard the Issara Naree and Ikan Senyur ocean vessels, not the Henry Jackman and Sedna Desgagnes vessels. (R. 23, Answer to Am. Compl. ¶ 1.) Midwest asserts that it bought the Issara Naree and Ikan Senyur shipments of road salt from Mexico and subsequently sold it to Great Lakes. (*Id.* ¶ 1.) Midwest admits to taking possession of the Henry Jackman and Sedna Desgagnes shipments of road salt in November 2014, but contends that it owned and paid for the Henry Jackman and Sedna Desgagnes road salt. (*Id.* ¶ 39.)

Now, Midwest has moved for leave to file its amended Answer, affirmative defenses, and counterclaim to Plaintiff's Second Amended Complaint. Midwest alleges that through discovery, which began in August 2015, it has learned additional facts that provide good cause for Midwest to amend certain answers, assert eight affirmative defenses, and allege two counterclaims pursuant to Federal Rule of Civil Procedure 13(a). Midwest specifically contends discovery has revealed, among other things, that: (1) Midwest purchased and at all times owned the Nord Barcelona shipment of road salt that was later transferred to the Henry Jackman and Sedna Desgagnes vessels; (2) Midwest never purchased road salt from Great Lakes that originated in Mexico; (3) Great Lakes and/or T&M engaged in potentially wrongful conduct with respect to the sale and purchase of the Nord Barcelona road salt and the subsequent

shipments of road salt aboard the Issara Naree and Ikan Senyur vessels; (4) T&M allegedly took and sold 6,900 metric tons of road salt owned by Midwest; and (5) to the extent that T&M allegedly purchased the Nord Barcelona road salt from Great Lakes, T&M failed to properly and reasonably protect its purported right to the road salt.

Based on this new information, Midwest requests leave to update its answers to ¶¶ 21, 25, 26, 27, 28, and 38. Midwest also requests leave to add eight affirmative defenses, including: (1) privilege and justification; (2) waiver; (3) consent; (4) abandonment; (5) void and unenforceable agreements; (6) intervening wrongful conduct; (7) failure to mitigate; and (8) failure to cover under the Illinois Uniform Commercial Code. Last, Midwest requests leave to file counterclaims against T&M for conversion (Count I) and set-off (Count-II). Midwest argues that T&M will not suffer prejudice by the amendments and will still have ample time to obtain the discovery it needs prior to the close of discovery on March 11, 2016.

T&M opposes Midwest's motion with respect to its request to file the eight affirmative defenses and the two counterclaims, but does not oppose Midwest's motion to file an amended Answer. T&M argues that the Court should deny the remainder of the motion because Midwest cannot adequately explain its delay in seeking leave to file the affirmative defenses and counterclaims, which, T&M alleges, are based on information Midwest had at the time it filed its original Answer.

**LEGAL STANDARDS**

"[T]he decision to grant or deny a motion to file an amended pleading is a matter purely within the sound discretion of the district court." *Soltys v. Costello*, 520 F.3d 737, 743 (7th Cir. 2008) (quoting *Brunt v. Serv. Employees. Int'l Union,* 284 F.3d 715, 720 (7th Cir. 2002)). "The Federal Rules of Civil Procedure adopt a liberal standard for amending: 'The court should freely

5

give leave when justice so requires.'" *Life Plans, Inc. v. Sec. Life of Denver Ins., Co.*, 800 F.3d 343, 357 (7th Cir. 2015) (quoting Fed. R. Civ. P. 15(a)(2)). "The Supreme Court has interpreted this rule to require a district court to allow amendment unless there is a good reason—futility, undue delay, undue prejudice, or bad faith—for denying leave to amend." *Id.* at 357–58 (citing *Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L.Ed.2d 222 (1962)).

"Defenses are pleadings, and as such, leave to amend is freely granted as justice requires." *Heller Fin., Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1294 (7th Cir. 1989). "The failure to plead an affirmative defense in the answer works a forfeiture only if the plaintiff is harmed by the defendant's delay in asserting it[.]" *Carter v. United States*, 333 F.3d 791, 796 (7th Cir. 2003). "The purpose of Rule 8(c) is to give the opposing party notice of the affirmative defense and a chance to rebut it." *Williams v. Lampe*, 399 F.3d 867, 871 (7th Cir. 2005) (citation omitted). "Thus, where the plaintiff has an opportunity to respond to a late affirmative defense, he cannot establish prejudice merely by showing that the case has progressed significantly since the defendants answered his complaint." *Id.*

"Rule 13 governs counterclaims and requires counterclaims to be stated at the time an answer is served." *Lerman v. Turner*, No. 10 C 2169, 2012 WL 1409526, at *1 (N.D. Ill. Apr. 23, 2012) (citing Fed. R. Civ. P. 13(a)). "District courts have discretion to deny a defendant's motion to file a counterclaim if the defendant fails to offer an explanation for not asserting the claim in the first instance or otherwise fails to explain its delay." *APC Filtration, Inc. v. Becker*, No. 07-CV-1462, 2009 WL 187912, at *3 (N.D. Ill. Jan. 26, 2009) (citing *Carroll v. Acme-Cleveland Corp.,* 955 F.2d 1107, 1114 (7th Cir. 1992)). As a judge in this district has observed:

> Fed.R.Civ.P. 15(a) allows parties to amend their pleadings and provides that this leave "shall be freely given when justice requires." Courts have interpreted these rules liberally, in furtherance of the goal of the Federal Rules to resolve disputes on the merits and in a single judicial proceeding whenever possible. The argument for amendment is

6

> especially compelling where the claim is compulsory. An amendment should not be denied merely due to the passage of time between the original filing and the attempted amendment.

*Jupiter Aluminum Corp. v. Home Ins. Co.*, 181 F.R.D. 605, 609 (N.D. Ill. 1998) (citations omitted).

## ANALYSIS

**I.     Motion to Amend Answer**

The Court first reviews Midwest's request to amend its Answer. T&M does not oppose this portion of Midwest's motion. Allowing Midwest to amend its Answer will not prejudice T&M or cause undue delay. Thus, in furtherance of the "liberal standard for amending," the Court grants Midwest's motion for leave to file its amended Answer. *See Life Plans, Inc.*, 800 F.3d at 357.

**II.    Motion to Add Eight Affirmative Defenses**

The Court next addresses Midwest's request to add eight affirmative defenses. T&M objects to the request based on undue delay.

**A**.     **Privilege and Justification**

Midwest first proposes the affirmative defense of privilege and justification claiming that it did not realize T&M was in the business of buying and selling road salt until discovery. According to Midwest, T&M's business dealings make it a competitor of Midwest, thus Midwest was privileged and justified to engage in the conduct T&M alleges in its Complaint. T&M argues that Midwest was well aware of its business dealings and should have asserted this defense in its original Answer. T&M points to an email, attached to its response at Exhibit 3, as proof that Midwest knew T&M was selling road salt because Midwest purchased road salt from T&M. (R. 57, Pl. Response Brief, at Ex. 3.) Midwest refutes T&M's allegation, arguing that the

7

email is actually a purchase agreement between Midwest and a third party, GMS Material LLC, not T&M.

### B. Waiver, Consent, and Abandonment

Midwest contends that its second (waiver), third (consent), and fourth (abandonment) affirmative defenses stem from T&M's failure to take reasonable steps to protect its alleged right to the Henry Jackman and Sedna Desgagnes shipments of road salt. Midwest asserts that, through discovery, it learned that T&M did not lay claim to the Henry Jackman and Sedna Desgagnes shipments until early 2015, after subsequent shipments of road salt—stored by Great Lakes at the Burley Dock in Chicago—were contaminated. Again, T&M argues that Midwest should have brought these defenses in its first Answer. Further, T&M asserts that it *did* lay claim to the road salt and that Midwest acknowledged that T&M had laid claim to a portion of the road salt in an email dated February 9, 2015. Midwest counters that the February 9th email only proves T&M failed to protect its alleged road salt in a timely manner. T&M did not respond to Midwest's allegation regarding the contaminated salt.

### C. Void and Unenforceable Agreements

In its fifth affirmative defense, Midwest maintains that the agreements between Great Lakes and T&M are void and unenforceable due to Great Lakes' written agreements with a third party, Seaway Marine Transport ("Seaway Marine"). Great Lakes allegedly contracted with Seaway Marine to assist in the transportation of the road salt at issue in this case from Canada to Chicago. Midwest asserts that Great Lakes produced the agreements with Seaway Marine during discovery and the agreements identify the form that bills of lading are supposed to take with respect to shipments from Quebec to Chicago. Midwest further asserts that T&M's bill of lading, which it attached to its Second Amended Complaint, does not comport with the

8

agreements. Once more, T&M responds that Midwest had all of the relevant information it needed to assert this defense at the time it filed its Answer. T&M attached its bill of lading to the Complaint and T&M alleges that Midwest had a copy of the agreement between Great Lakes and Seaway Marine in its possession before litigation began, as it produced a copy to T&M in its document production. Midwest argues that it was not until after receipt of discovery that it learned that Great Lakes allegedly provided T&M with bills of lading pursuant to the Seaway Marine agreement. Midwest further contends: "[t]hat [Midwest] had a copy of the Seaway Marine agreement does not mean it had knowledge of Great Lakes' and T&M's business dealings and that T&M's bills of lading were provided pursuant to that same Seaway Marine agreement." (R. 58, Midwest Salt's Reply Brief, at 6.) Midwest contends that it had a copy of the agreement because it owned the road salt being shipped, but had no knowledge of T&M's transactions.

### D. Intervening Wrongful Conduct

Midwest waited to move for its sixth affirmative defense, alleging intervening wrongful conduct on the part of Great Lakes, because it claims that it did not believe it had a good faith basis to file it at the time of its initial Answer. T&M argues that Midwest should have filed this defense with its original Answer because T&M listed Great Lakes' alleged wrongful conduct in its Complaint. In response, Midwest asserts that "merely because T&M has alleged it purchased certain road salt from Great Lakes does not make it so and does not provide [Midwest] with grounds to accuse Great Lakes of wrongful conduct." (R. 58, Midwest Salt's Reply Brief, at 6.) Midwest argues it was not until discovery that it found proof of Great Lakes' wrongful conduct

9

in the form of an email from a Great Lakes employee fraudulently claiming that Midwest knew the Nord Barcelona salt[1] was for T&M.

### E. Failure to Mitigate and Failure to Cover under Uniform Commercial Code

Finally, in its seventh and eighth affirmative defenses, Midwest alleges that T&M failed to mitigate its damages or cover its losses as required by applicable case law and the Illinois Uniform Commercial Code. T&M counters that Midwest should have filed this affirmative defense in its original Answer as it is rooted in case law. Midwest responds that it could not have filed this defense previously because it did not know to what extent, if any, T&M had tried to mitigate its damages or cover its losses until after discovery.

### F. T&M's General Arguments

Based on these individual arguments, T&M's overall objection to the affirmative defenses is solely undue delay. Specifically, T&M argues that Midwest had all the information it needed to file these defenses at the time of its original Answer and because it did not raise the defenses then it waived its right to raise them now. Nonetheless, as demonstrated by the assertions above, a number of Midwest's proposed affirmative defenses are based on information that Midwest did not have access to until discovery, including: (1) the second, third, and fourth affirmative defenses, which Midwest brings now after learning that T&M may have only lay claim to the 106th Street Dock salt after other salt was contaminated; (2) the sixth affirmative defense, which Midwest brings now after learning more information about Great Lakes wrongful conduct; and (3) the seventh and eighth affirmative defenses, which Midwest brings now based on information about what T&M did or did not do to mitigate damages. While Midwest possibly could have brought the first and fifth affirmative defenses in its original Answer, T&M provided

---

[1] The Nord Barcelona shipment was subsequently transferred to the Henry Jackman and Sedna Desgagnes vessels, and is thus the salt at issue in this case.

the Court with almost no supporting case law for its position that this Court should deny Midwest's motion merely because of delay. *See Carter*, 333 F.3d at 796 (holding that a defendant's delay in filing an affirmative defense only leads to forfeiture if the plaintiff is harmed by the delay).

In particular, T&M cites to just one case where a court refused to allow a defendant leave to plead affirmative defenses, namely, *Cipa Mfg. Corp. v. Allied Golf Corp.,* No. 94 C 6574, 1995 WL 337022 (N.D. Ill. June 1, 1995). *Cipa* is distinguishable from the present case. There, the district court determined that the defendant's proposed affirmative defense was actually a counterclaim and denied the defendant's motion because, in part, allowing the defendant to file a counterclaim mere months before the trial would force the court to extend discovery and would prejudice the plaintiff at such a late stage in the litigation. *See id.* Here, T&M has not argued that it would suffer any prejudice if the Court grants Midwest leave to file its affirmative defenses, nor did it claim that Midwest's affirmative defenses are futile. It is well-settled that for a court to deny leave to amend based solely on undue delay the delay must be considerable and prejudicial. *See Soltys,* 520 F.3d at 743 (upholding denial to amend because the moving party brought its motion two weeks before the trial date, which had already been postponed because of the moving party's delay); *Alinsky v. United States,* 415 F.3d 639, 648 (7th Cir. 2005) (upholding denial to amend because moving party filed its motion three years after the start of the litigation and eight months after the close of discovery); *Perrian v. O'Grady,* 958 F.2d 192, 195 (7th Cir. 1992) (affirming denial because moving party filed its motion during the final pre-trial conference). T&M has not identified any such prejudice.

In the present lawsuit, discovery is ongoing, the parties have not filed any dispositive motions, and the Court has yet to set a trial date. With this in mind, allowing Midwest to add its

affirmative defenses will not prejudice T&M. Based on the circumstances in this case, the Court grants Midwest's motion for leave to file its affirmative defenses.

### III. Motion to Add Two Compulsory Counterclaims

Last, the Court addresses Midwest's motion to file two compulsory counterclaims. Midwest seeks to file conversion and set-off counterclaims against T&M based on T&M's allegation that it sold 6,900 metric tons of the Henry Jackman and Sedna Desgagnes shipments of road salt to a third party. Both parties rightfully agree that Midwest's counterclaims are compulsory. A compulsory counterclaim is "one that 'arises out of the same transaction or occurrence that is the subject matter of the opposing party's claim.'" *Bd. of Regents of Univ. of Wis. Sys. v. Phx. Int'l Software, Inc.*, 653 F.3d 448, 470 (7th Cir. 2011) (quoting Fed. R. Civ. P. 13(a)). Midwest's allegation—that T&M sold road salt belonging to Midwest—arises out of the same transaction as T&M's claim against Midwest. T&M argues that Midwest waived its right to pursue compulsory counterclaims by failing to file them in its original Answer even though Midwest was aware of the underlying facts necessary to bring the counterclaims at that time. On the other hand, Midwest counters that it originally denied T&M's allegation regarding the 6,900 metric tons because it did not believe the allegations were accurate, thus Midwest did not have a good faith basis for filing the counterclaim in its original Answer. Midwest contends it only learned during discovery that it may not have received all of the road salt it purchased from the Nord Barcelona.

T&M points to three cases in support of its position that the Court should deny Midwest's motion, namely, the district court decisions in *APC Filtration,* and *Cipa,* and the Seventh Circuit's decision in *Carroll*. All three cases are distinguishable from the present case. In *APC Filtration*, the district court denied the defendant's motion to file counterclaims due in part to the

12

defendant's delay, but also because the counterclaims were merely permissive, not compulsory, thus the defendant would not suffer any prejudice from bringing the claims in a separate action. *See APC Filtration, Inc.*, 2009 WL 187912, at *3. Similarly, in *Cipa*, the court struck the defendant's affirmative defense because the court determined the defense was actually a permissive counterclaim that the defendant could address in a separate lawsuit. *See Cipa Mfg. Corp.*, 1995 WL 337022, at *2. In the present case, the counterclaims are compulsory, namely, if the Court denies Midwest's motion to add the counterclaims, Midwest is barred from bringing a separate action against T&M. In short, while T&M has not argued that it will be prejudiced if the Court grants Midwest's motion, Midwest certainly will be if the Court denies it. Meanwhile, in *Carroll*, the Seventh Circuit upheld the denial of the moving party's request to file a counterclaim because the moving party had no excuse for waiting three years after the start of the litigation and months after the close of discovery to file it. *See id.* at 1114. Midwest has offered an explanation for its delay, and, as discussed, this delay is not unreasonable.

Midwest's motion is more akin to the facts of *Jupiter Aluminum Corp. v. The Home Ins. Co.*, 181 F.R.D. 605 (N.D. Ill. 1998). There, the district court allowed the defendant to file a counterclaim two years after the filing of the original complaint because of a number of factors, including: (1) the counterclaim was compulsory; (2) there was no bad faith, dilatory motive, or undue delay on the part of the defendant; and (3) the plaintiff failed to demonstrate that it would be prejudiced by the filing. *Id.* at 609. The district court found the defendant's request especially compelling because the counterclaim was compulsory. *Id.* T&M has not argued, and nothing in the record indicates, that Midwest acted in bad faith or had a dilatory motive for waiting to file these counterclaims. Midwest's filing will not prejudice T&M as the parties are still engaged in discovery and the Court has yet to set a trial date. Though this Court has broad

13

discretion to grant or deny a motion for leave to amend, the Court should grant when "justice so requires." *Life Plans, Inc.*, 800 F.3d at 357 (quoting Fed. R. Civ. P. 15(a)(2)). Here, justice requires that the Court grant Midwest's motion to file both compulsory counterclaims. If the Court denies Midwest's motion, Midwest will forever lose the opportunity to bring possibly valid claims against T&M.

## CONCLUSION

For the above stated reasons, the Court grants Defendant Midwest Salt, LLC's motion for leave to file its amended Answer, affirmative defenses, and counterclaim to Plaintiff's Second Amended Complaint.

**Dated:** February 22, 2016

                              **ENTERED**

                              _____
                              **AMY J. ST. EVE**
                              **United States District Court Judge**